(89 South. 889)

No. 23540.

SEVIN et ux. v. TEXAS & P. RY. CO.

(Oct. 4, 1921. Rehearing Denied Oct. 31, 1921.)

(Syllabus by the Court.)

Railroads ⚙══389(1)—Inevitable accident held cause of child's injury by train.

Where a minor child of tender years, under the control of his parents, being sent upon an errand, voluntarily or unwittingly places himself in a position of such peril with respect to a moving railroad train, not shown to be unlawfully operated, that injury and possible death are inevitable, and those consequences follow, the parents have no cause of action in damages against the company operating the train.

Appeal from the Twenty-Eighth Judicial Court, Parish of Jefferson; F. A. Middleton, Judge.

Action by Paul Sevin and wife against the Texas & Pacific Railway Company. Judgment for the defendant, and the plaintiffs appeal. Affirmed.

W. Winn Wright, of New Orleans, for appellants.

Spencer, Fenner, Gidiere & Phelps, of New Orleans, and L. Robert Rivarde, of Hahnville, for appellee.

Statement of the Case.

MONROE, C. J. Plaintiffs, who were the parents of a boy about six years old, bring up this appeal from a judgment rejecting their demand for damages, alleged to have been sustained by them by reason of injuries inflicted upon the boy, which resulted in his death, and which are attributed to the negligence of defendants' agents.

The case disclosed by the evidence is as follows:

Plaintiffs, with their several children, were living on the southeast corner of Lafayette avenue and Third street in Gretna, in a house fronting on Lafayette avenue, with a side line running back on Third street and a gate opening on that street from their back yard at a distance of about 100 feet from the property line on Lafayette avenue. On May 20, 1918, between 3 and 5 o'clock p. m., Mrs. Sevin sent her little boy, who is said to have been unusually intelligent, upon an errand to her sister, who also lived on Lafayette avenue, but on the next square, so that, in order to reach her residence, it was necessary for the child to cross Third street, upon which was the track of defendant's railroad. From the testimony of Mrs. Sevin it appears that they rarely used their front door as a means of entrance or exit, and the little boy left the premises by the gate, and, in all probability, started to cross the track diagonally to the opposite corner, a little beyond which on Lafayette avenue his aunt lived. That, however, is merely a deduction from the facts that he was sent on the errand, that he did not go

out the front door, and that he was next seen, mortally injured, lying within a foot and a half of the track, and of the train which was then passing, at a point 90 feet to the eastward of the corner, or a little nearer to the corner than the gate, no one having seen him from the moment he left his mother, or having seen the accident. The person who first saw him in the position thus described was Leonard Miller, a young man who was in the employ of the Trans-Mississippi Terminal Company (an auxiliary of the defendant), and who, with his comrade, Jesse Baker, being on their way to McDonoughville (just below Gretna) had concluded to catch and ride on the train, which they heard blow, and with that view had started to run from where they then were (two squares to the eastward) to Third street. When they had reached about the middle of the second square, the engine passed down Third street, and, seeing that it had a train behind it, they slackened their speed, and, getting to the corner in a walk, Miller caught on the car that was then passing, and which was the third, fourth or fifth from the engine, leaving Baker, who had concluded to wait for the caboose, standing on the corner. Miller had, however, barely got on the car when his attention was attracted to the boy, whom he saw lying as above stated, and making some apparently futile efforts to get up or change his position, and heard him calling "Mamma," whereupon, or a moment later, he jumped off the car, and, knowing, apparently, that the air brakes could be controlled from the caboose as well as from the engine, started in the direction of the caboose in order to convey his information to the conductor, who was in the caboose, and, through him, have the train stopped. On his way he called to Baker to see to the boy, and, soon afterwards found a brakeman who carried his message to the conductor, and the train was stopped by the time the caboose reached the next corner, say, 300 feet. Baker, in the meanwhile, went toward the boy, and, when within about 10 feet of him, saw him attempt to raise himself, and in so doing fall, with his head over the track, and he pulled him away; otherwise (he says) his head would have been cut off, the hat of the witness having been knocked off by the footboard. He says also that the child was then about five or six cars from the engine; that he held him in his arms until the train passed, and both he and Miller fix the speed of the train as not exceeding six miles an hour, which estimate is corroborated by that of Lafosse, the engineer, Vallery, the fireman, and King, the conductor.

Mrs. Sevin gives the following, with other testimony:

"Q. (by the court). How short a time after the boy met with the accident did he speak to you? A. Immediately upon my arrival. Q. Was the train that had apparently injured him in the neighborhood at that time? A. The train was just leaving, and I am sure it was running at 25 or 30 miles an hour."

### Cross-examination:

"Q. Did the accident happen immediately after you sent your child to your sister's house? A. Right afterwards. Q. Did you see the train coming? A. I did not see the train, because I was not outside; I was in my kitchen. The train was coming so fast that it looked as if it was going to raise the house. * * * Q. Did you hear the train coming before you sent your child to your sister's house? A. No; otherwise I would not have sent him. * * * Q. You did not see the accident at all? A. No, sir. * * * Q. Do you know which way the train was going that is said to have injured your child? A. Yes; the train was going down towards Algiers. Q. You saw the train going down? A. No; I didn't, but I heard it going. Q. Did you see the rear of the train? A. I could see but one coach, because the train was so far. Q. How far away from your house was it? * * * Q. Was it a mile or half a mile? A. As near as I can remember, about half a mile. * * * It must have been about half a mile."

J. W. Seele testifies that he was seated in front of Crocketts' Hall (said to be on Lafayette avenue 250 feet from Third street), and saw the train go down Third street; that the speed was between 20 and 30 miles an hour; that prior to the accident he had never ridden on a railroad train, but that he had been a chauffeur in the employ of a concern that was engaged in handling freight; that his employers had automobiles and trucks; that he was employed as private chauffeur to run them; that, seeing an automobile approach him, he could tell the speed at which it was moving; that he went down there after it was over; saw the child "lying across the track"; "he was cut right across here, cut open here, and up here, in through his side (witness indicating, across the abdomen over the center of the body);" that he saw blood on the track; knew that the T. & P. freight train ran over him; that he did not see the train run over him; that as to the accident he is testifying merely to what some one told him; that he and Mr. Strehle were seated in front of Crocketts' Hall when the accident occurred; that they ran to the scene; saw no one else there; that Dr. Gelbke came afterwards and picked up the child; that he and Strehle were the only two persons there; that Strehle was the first person to see the child; that he knew that the child was cut because Strehle told him so; that he stayed at the corner (90 feet from the child and 250 feet from Crocketts' Hall) to answer the telephone or fire alarm at Crocketts' Hall; that he found the child 150 feet from the corner (the measured distance being 90 feet); that the child was lying on the west side of the track; after which he seems to have been convinced that it was lying on the east side, and admits that he did not go to the child at all, but says that he jumped on Dr. Gelbke's automobile as it passed carrying the child to the hospital; that he did not see any wounds, but saw blood.

Wm. H. Strehle also saw the train from the front of Crocketts' Hall, and estimates its speed at from 20 to 25 miles an hour. After it passed his attention was attracted by people running down there; and when he got to the corner he stood and looked over, and about 11 feet from the corner there was a little boy, but just then a man from a mill called him, and he went to the mill, and when he returned the child was gone. The child had been lying on the ground "across by the track; it was all bloody around there."

Thomas Favalora, who lived on one of the corners of Lafayette avenue and Third street, was back in his yard sawing wood when the train passed. He was quite positive that it was moving at the rate of 10 miles an hour. After the train passed he saw the little boy, heard him speak, and took a sack out and covered him with it. The mother then came and other people, and after them Dr. Gelbke, who put the child in his automobile and carried him over the river. The distance from where the child was lying to the corner was 90 feet; he measured it. There was nothing special about the train to attract his attention, but he saw it pass; the speed was not unusual, but it was 10 miles an hour. He says that he was the only person who picked the child up except the doctor.

Mr. Lafosse (the engineer), in addition to his testimony that the speed of the train at the time of the accident was 6 miles an hour, further testified that, with the load that he was handling and the exceptionally light engine with which he was provided, he had not been enabled to get any greater speed than 18 miles an hour during his trip.

He and the fireman also testified that neither of them saw the little boy at all; that they were unaware that he had been injured, did not hear of it until the next day, when they were called to appear before the coroner's jury; and that it was only then

that they learned why it was that the air brakes had been applied from the caboose.

No one has testified that the boy was ever seen on the track in front of the locomotive, or that he was struck by the locomotive. The learned judge a quo admitted in evidence as part of the res gestæ the following testimony of Mrs. Sevin, to wit:

"When I got there [place of the accident] I asked him [the little boy], 'Charley, who did this?' and he answered, 'Mamma, I attempted to cross the track, and I hadn't seen the train, and the train cut me.'"

Mrs. Sevin also gives the following, with other, testimony:

"Just by opening the gate I came right out, and my child was right there. * * * Q. Where did you find the body of your child on the T. P. track; how far from your gate? A. About three or four steps from the gate."

The question incorrectly assumes that the child was *on* the track when found by his mother, and seems to refer to him as no longer living; the facts being that he was then lying *near* the track, and that he survived the accident for about three hours.

### Opinion.

The engineer, fireman, conductor, Miller, who caught on the train and then jumped off, and Baker, who pulled the boy out as he was about again to fall under the wheels, were in better position to judge of the speed of the train than the other witnesses who have testified on that subject, and, in the main, were better qualified by experience. The distance between the gate from which the boy emerged and the track was so short that it may, and probably was, covered by him in two or three seconds; since a boy in his seventh year, starting upon an errand to the house of an aunt, say, 200 feet distant, is not apt to move with the deliberation of an older person, and, as in this instance, it would appear that he saw nothing to obstruct his progress, it seems quite certain that the time which elapsed between his emergence from the gate and his reaching the track was entirely insufficient to have enabled the engineer to stop the train before striking him, even if it were shown that he approached the track in front of the engine and was seen by the engineer. Counsel for plaintiff says in his brief that the only direct evidence as to the manner of the accident is the statement of the child, and that it is evident therefrom that he was struck by the engine; for, if the engine had already passed, he would have seen the train, and, if. he had walked or run toward the train, he would have been seen by one of the members of the crew, of whom there were four, including the conductor.

"It is highly improbable," says the counsel, "that the child deliberately walked into the train, unless he endeavored to commit suicide, so that there can be no other hypothesis than that the child was struck and killed by the engine, as he testified."

But the child did not testify in the case. His statement to his mother, who testified through an interpreter, was admitted as part of the res gestæ; and not even the mother and still less the boy, was cross-examined as to the meaning of that statement, nor does the statement contain the word "engine." It reads, "I attempted to cross the track, and I hadn't seen the *train* and the *train* cut me;" and it is fairly evident that the statement is not in the language of the boy, who would have used a shorter word than "attempted." If it is improbable that he should deliberately have walked into the train—and we concede it—equally improbable is it that he should deliberately have walked immediately in front of the approaching engine. He placed himself where he did because he saw neither engine nor train. As to the probability of his having been seen by a member of the crew, the only evidence that we have as to the whereabouts of the crew at that time points to the conclu-

sion that the conductor and one brakeman were in the caboose; that another brakeman was on the engine; that the third was on one of the 15 or 18 cars constituting the rest of the train; and that the approach by, and accident to, the boy happened, as we infer, within less time than one minute.

Plaintiffs have failed to show that it can properly be attributed to the fault of defendant or its agents, and are not entitled to recover.

The judgment appealed from is therefore affirmed.